**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW JERSEY**

**CAMDEN VICINAGE**

| | | |
|---|---|---|
| _____ | : | |
| VERONICA CABRERA individually and | : | |
| as Administratrix of the Estate of Freddy | : | |
| Baez Jr., Deceased | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | Civil No. 16-05653 (RBK) |
| CAMDEN COUNTY | : | |
| and | : | **OPINION** |
| POLICE CHIEF JOHN SCOTT | : | |
| THOMSON | | |
| and | | |
| CAMDEN COUNTY POLICE OFFICERS | | |
| JOHN DOE #'s 1–4 | | |
| | | |
| Defendants. | | |
| _____ | | |

**KUGLER,** United States District Judge:

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment [Doc. No. 42] on Plaintiff's claims for Excessive Force (Count I); Failure to Intervene (Count II); Conspiracy (Count III); Supervisory Liability (Count IV); *Monell* Liability (Count V); and state law Wrongful Death and Survival claim claims (Counts VI and VII).  For the reasons below, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## I.  FACTUAL BACKGROUND

### A.  Introduction

This case involves the alleged use of deadly force. Two Camden County Police Officers responded to a domestic dispute and shot and killed Freddy Baez, Jr. The estate of Mr. Baez ("Plaintiff") subsequently filed a lawsuit and argue that Freddy Baez was unarmed. The timeline of events, in relevant part, is as follows.

### 1. November 23, 2015: Events the Night Before the Shooting

Freddy Baez, Jr. and Ashley Purnell had a child together. Pl. Resp. Statements of Material Facts ("SMOF") [Doc. No. 45-1] at ¶ 3. The two broke up in early November 2015. *Id.* According to Ashley's mother, Rowshon Purnell, Baez physically abused Ashley. *Id.*

On November 23, 2015, a domestic dispute ensued between Ashley and Baez. *Id.* A neighbor called the police. *Id.* at ¶ 5. At approximately 9 P.M., the Camden County Police Department ("CCPD") responded and arrived at Baez's home. *Id.* Minutes later, Baez posted the following status on his Facebook account: "Family and friends I love u if I see judgement [*sic*] day had enough of cops and hating ass bm." *Id.* at ¶ 6. This status also included a gun emoji. *Id.*

Just hours later, another person called the Camden Police to report a second disturbance at the Baez residence. *Id.* at ¶ 7. When the police arrived, they overheard a male yelling at Ashley to open the door. *Id.* The man did not permit the police in the house. *Id.* Ashley and Baez continued to yell as the Police investigated. *Id.* The investigation also revealed that one of them had expelled a fire extinguisher. *Id.*

### 2. November 24, 2015: Events in the Hour Before the Shooting

Ashley stayed at her mother's the following day. At 6:18 P.M., Baez posted a Facebook video in which he threatened Ashley. He stated "I'm about to put her ass on black. It's a rap.

I'm about to fuck it all up for her now because you know that I'm saying?" *Id.* at ⁋ 9. Carlos Soto, a personal friend of Baez, also appeared in the video. *Id.* at ⁋ 10. He later told detectives that Baez drank a pint of Hennessy before the recording. *Id.*

After posting this video, Baez called Ashley seven times. *Id.* at ⁋ 11. Ashley returned his call and called back twice. *Id.* They also exchanged texts between roughly 6:30 P.M. and 6:50 P.M. *Id.* Ashley told Baez she wanted him to leave her alone. *Id.* Baez ignored these wishes and traveled to Ashley's mother's home. According to Plaintiff, Baez went there to retrieve a cellphone.

### 3. Baez Arrives at the Purnell Residence

Baez repeatedly banged and kicked Ashley's mother's door. Def. Exhibit D-13, Statement of Rowshon Purnell of November 24, 2015 ("Rowshon Purnell Statement") [Doc. No. 42-16]. Ashley refused to talk to him or go outside. *Id.* Ashley then told her mother to call the police. Pl. Resp. SMOF at ¶ 12. Ashley also texted Baez and said the police were coming. *Id.* at ⁋ 13. Baez responded, "I just ant [*sic*] my phones good [*sic*] diggij [*sic*] bitch." *Id.* Ashley said she would give him his cellphone once they resolved a previous dispute about a car and if Baez left the house. *Id.* She then sent her last text to Baez: "Get away! U stupid tgey [*sic*] on there [sic] way!" *Id.* Baez responded, "No u r." *Id.*

### 4. Rowshon Purnell's First 9-1-1 Call

Rowshon called 9-1-1 shortly after Ashley texted Baez. Rowshon told the dispatcher that her "daughter's son's father" was banging on the door and refusing to go away. *Id.* at ⁋ 16. She said, "[Ashley] doesn't want nothin' to do . . . he's still knockin' on my door." *Id.* She also said she did not know if he had a gun. *Id.* Two minutes later, CCPD Officers Johnathan Kerper and Anthony Painchaud ("Defendants") were dispatched to the scene. *Id.* at ⁋ 17.

### 5. Rowshon Purnell's Second 9-1-1 Call

Eight minutes after her first 9-1-1 call, Rowshon called 9-1-1 again. *Id.* at ¶ 19. She spoke with a different dispatcher and informed her that Baez continued to bang on her door. *Id.* She said again that she did not know whether Baez had a gun. *Id.* The dispatcher immediately asked her whether she saw a gun or whether Baez was known to carry a gun. Rowshon Purnell responded, "No" and then said, "I don't really know." *Id.* During the same 9-1-1 call, she told the dispatcher that Baez had given Ashley a black eye earlier in the day. *Id.*

### 6. The Officers Arrive at the Purnell Residence

Thirty seconds after Rowshon's second 9-1-1 call, Officers Kerper and Painchaud notified dispatch that they arrived to the area. *Id.* at ¶ 23. According to Kerper, dispatch then informed them that the suspect *may* have a firearm. *Id.* (emphasis added). The dispatcher told the officers that the caller "[didn't] know whether he (Baez) [had a gun] — even though no [gun] was seen." *Id.* at ¶ 32.

The officers did not immediately find Rowshon's home when they entered the neighborhood. *Id.* at ¶ 25. A man called down to the them from a second story window and pointed to the location. *Id.* Painchaud found this odd, and suspected that the dispute must have been loud for a distant neighbor to point it out on his own accord. *Id.*

The officers walked next to the side of the Purnell residence and approached the front of the house. *Id.* As they approached, they de-holstered their firearms. *Id*. at ¶ 29. Officer Painchaud peeked around the corner of the house and saw a man on a small landing, hunched over between the storm door and the main door. *Id*. ¶ 32. Painchaud heard Baez say, "I need my phone" in a low voice, even though he appeared to have a phone in his hand. *Id.* Baez knocked repeatedly on the door. *Id.* Kerper and Painchaud briefly conferred and agreed that

Painchaud would walk straight towards Baez while Kerper would take a wider turn to provide "cover." *Id.* at ¶ 35. At that point, the officers still did not know if Baez had a gun. *Id.*

### 7. Accounts of the Shooting

The parties dispute what happened next. Painchaud claims that he approached Baez with his weapon at a "low-ready position" (at a 45-degree angle facing downwards). Def. SMOF at ¶ 36. Painchaud explained:

> As we came up and brought the light up, I asked Mr. Baez to show me his hands, you know, as we were approaching he was knocking on the door. When I asked him to show me his hands, his left hand came out from wherever it was tucked in and he said, a fuck something. I don't know if it was fuck you or I heard fuck, heard a bang, and I saw a muzzle flash. He had a gun in his left hand and at that time, myself and Officer Kerper, returned fire and basically we retreated to cover. We split paths. I retreated back to the corner of the building that we originally came from.

*Id*.

Kerper recalls that Painchaud had his weapon pointed directly at Baez as he approached. *Id.* at ¶ 39. When Painchaud ordered Baez to put his hands up, Baez "turned and started to — started to put his hands up. I can't remember one hundred percent correctly." *Id.* at ¶ 38. Kerper claims that Painchaud attempted to holster his weapon when Baez pulled out a pistol and shot at Kerper. *Id*. Kerper heard the bullet whiz past his right ear and saw the muzzle flash of Baez's weapon. *Id*. Kerper shut his eyes. *Id.* When he opened them, he saw Painchaud returning fire. He then fired at Baez as well. *Id.* Kerper then retreated across the courtyard to a mulch bed. *Id.* Painchaud also retreated to his original position. *Id.* In total, Kerper fired thirteen shots, and Painchaud fired eight shots. *Id.*

Plaintiff states that Baez had no weapon and did not fire. Pl. Resp. SMOF at ¶ 39. Further, Plaintiff states that the officers did not order Baez to raise his hands. *Id.* at ¶ 36. In addition, Plaintiff says that the officers were much closer to Baez during the shooting. *Id.* at ¶

39.  While the officers claim to have been ten feet away, Plaintiff claims they were five feet from Baez.  *Id.* ¶ 43.

After the shooting began, Officer Painchaud saw Baez fall to the ground and radioed that shots had been fired.  Painchaud Dep. at 68:21 to 69:8.  Officer Kerper yelled, "225! Code 5! Shots fired! Shots fired at officers! Male down!"  Dispatch Call at 6:59:51 P.M. ("6:59:51 Dispatch Call") [Doc. No. 42-25].   Upon receiving Painchaud's call, CCPD dispatch immediately requested an ambulance.  Baez appeared to be moving, so Kerper "screamed at the top of [his] lungs" and told him twice not to move.  Kerper Dep. at 55:23-56:3. At this point, Baez fell over, face down.  *Id.* at 56:13-15.

The officers then checked to see whether they were injured.  According to Officer Kerper,

> Officer Painchaud and I both screamed to make sure the other was okay, he screamed to me first.  He asked me if I was hit, I felt my body briefly.  This was all within seconds.  I said, I couldn't feel any blood, and I couldn't feel any holes. I asked if he was hit.  He said the same, that he wasn't — couldn't feel any blood or couldn't feel any holes.

*Id.* at 56:15-21.  Kerper then radioed, "Shots fired! He's still moving! Send 52s (ambulances)!" Dispatch Call at 7:00:24 ("7:00:24 Dispatch Call") [Doc. No. 42-27].  Painchaud also radioed, "Suspect down. Shots fired at police. Shots fired. Suspect is down."  7:00:45 P.M. Dispatch Call ("7:00:45 P.M. Dispatch Call") [Doc. No. 42-28].

## 8.  Aftermath of the Shooting

Next, Officers Painchaud and Kerper secured the scene.  Kerper Dep. at 57:3-9.  The officers observed Baez bleeding heavily.  *Id.* at 57:22 to 58:20.  Officer Kerper saw a silver .32 caliber revolver just to the right of Baez's head.  *Id.*  He then kicked the weapon away from Baez before placing him in handcuffs.  *Id.* at 59:24 to 60:4.

CCPD Sergeant Terry Watkins arrived at the scene and found a silver revolver in the grass in front of the stoop. Pl. Resp. SMOF ¶ 51. CCPD Police then photographed the silver revolver. They also recovered a .32 caliber class discharged lead bullet from the dwelling across from the courtyard from the Purnell residence. Detectives then took statements of potential witnesses in the area. Carlos Soto, Baez's friend, confirmed that Baez carried a silver revolver. *Id.* at ¶ 53.

Doctors subsequently pronounced Baez dead at 7:25 P.M. During that time, hospital staff recovered a .32 caliber class discharged lead bullet from Mr. Baez's clothing. Report of the Camden County Prosecutor's Office, October 12, 2016 ("CCPO Report") [Doc. No. 42-47] 16-17. Dr. Gerald Feigin, M.D. performed the autopsy and concluded that Baez died of five gunshot wounds. Autopsy Report [Doc. No. 42-29]. A toxicology detected two synthetic cannabinoids in Baez's blood. These cannabinoids have psychoactive (hallucinogenic) effects. *See* Toxicology Report [Doc. No. 42-30].

### 9. The Timing of the Shots

Several witnesses in the area overheard the shooting. Four of them— Jermaine Hunt, Barbara Jones, Ashley Purnell, and Rowshon Purnell— recall hearing a pause in the shooting.

Barbara Jones heard six shots and then went from her bed to her dresser to call the police. Pl. Exhibit N, Barbara Jones Statement ("Jones Statement") [Doc. No. 44-1] 2:31-38. After this first round of firing, she heard yelling, profanity, and a male voice. *Id.* at 5:1-24. The male voice said, "Now what, bitch? Now what, bitch? Come over here or stop or something to that effect." *Id.* at 4:41-43. She also heard a pause in the shooting that lasted about thirty seconds. *Id.* at 5:33-40. Then she heard another four to six shots. *Id.* at 2:31-38.

Ashley and Rowshon Purnell heard a similar pause in the shooting. Ashley Purnell recalls a pause that lasted between one minute and a minute and a half. Ashley Purnell Statement at 21:7-9. However, she did not hear any commands from the officers at any point. *Id.* at 21:41-44. Rowshon heard an initial flurry of seven to eight shots, a pause, and then more shots. Rowshon Purnell Statement at 29:25-45.

Jermaine Hunt allegedly witnessed the shooting. Hunt heard gunshots from his bedroom. Pl. Exhibit M, Jermaine Hunt Statement ("Hunt Statement") [Doc. No. 44-1] 3:5-29. He laid on the floor for cover. *Id.* He then got up and looked out the window. *Id.* He claims that he heard about seven gunshots, and then an officer say, "get down [and] don't move." *Id.* at 4:1-32. He then heard five more shots. *Id.* at 6:16-19. Hunt also stated that when he heard the gunshots, he did not know whether Baez was up or down because he did not see Baez in the doorway. *Id.* at 6:11-14.

### B. Procedural History

Based on the above events, the estate of Freddy Baez ("Plaintiff") filed a Complaint [Doc. No. 1] in this Court alleging various causes of action. Plaintiff claims that Officers Painchaud and Kerper used excessive force against Baez (Count I — Excessive Force), failed to intervene to prevent a constitutional violation (Count II — Bystander Liability), and conspired to deprive Baez of his constitutional rights (Count III — Conspiracy). Plaintiff also claims that Police Chief John Scott Thomson is liable on a theory of "supervisory liability" (Count IV — Supervisory Liability). Finally, Plaintiff brings a *Monell* claim against Camden County and Police Chief John Scott Thomson (Count V — *Monell* Claim). Plaintiff's state law claims include a wrongful death claim (Count VI — Wrongful Death) and a survival claim (Count VII — Survival).

Defendants Camden County, John Scott Thomson, Anthony Painchaud, and Jonathan Kerper now move for summary judgment on all claims. Defendants argue that Plaintiff's excessive force claim (Count I), bystander liability claim (Count II) and conspiracy claim (Count III) fail because there was no excessive force or constitutional violation, making the officers entitled to qualified immunity. Defendants similarly argue that Plaintiff's state claims — wrongful death (Count VI) and survival (Count VII) — fail for the same reason.

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" if it could alter the outcome, and a dispute is "genuine" if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The movant bears the burden of showing the absence of a "genuine issue of material fact." *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The party may satisfy its burden by "produc[ing] evidence showing the absence of a genuine issue of material fact" or "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

If the movant makes this showing, the nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmovant must "point to concrete evidence in the record that supports each and every essential element of his case." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995). "When opposing

summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 Fed. App'x. 353, 354 (3d Cir. 2007) (citation omitted).  The Court's role is not to weigh the evidence and decide the truth, but to determine if there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.  In making that decision, "[a]ll facts and inferences are construed in the light most favorable to the nonmoving party," *Boyle v. Cnty. of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir. 1998), and credibility determinations are for the fact finder.  *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.    DISCUSSION

Defendants make several arguments in support of their motion for summary judgment. They argue that Plaintiff's claims fail because they are entitled to qualified immunity and because there is no triable issue of fact as to whether they used excessive force or violated any of Baez's constitutional rights.  The Court addresses these arguments below, beginning with Plaintiff's federal excessive force, failure to intervene, and conspiracy claims against Officers Painchaud and Kerper.  The Court then considers Plaintiff's related supervisory liability and *Monell* claims against Chief Thompson and Camden County.  Finally, the Court turns to Plaintiff's state law wrongful death and survival claims against all Defendants.

### A.  Federal Claims

Qualified immunity is an affirmative defense that "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct."  *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (quoting *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012)).  Qualified immunity will not, however, act as a shield for "the official who knows or should know he is acting outside

the law." *Noble v. City of Camden*, 112 F. Supp. 3d 208, 225 (D.N.J. 2015) (quoting *Butz v. Economou*, 438 U.S. 478, 506–07 (1978)).  In deciding whether qualified immunity applies, the Court must decide whether the facts alleged, taken in a light most favorable to the plaintiff, make out: (1) a violation of a constitutional right; and (2) that the constitutional right at issue was "clearly established" at the time of a defendant's alleged misconduct.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Courts may consider these issues in either order.  *Id.* at 236.

Although the question of qualified immunity is generally a question of law, "a genuine issue of material fact will preclude summary judgment on qualified immunity."  *Giles v. Kearney*, 571 F.3d 318, 326 (3d Cir. 2009); *see also Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) (noting that "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis").  In other words, the Court must deny summary judgment if, on a plaintiff's version of the facts, defendants violated the plaintiff's clearly established constitutional rights.

For the reasons that follow, Officers Painchaud and Kerper are entitled to qualified immunity because no reasonable jury could find that they violated a clearly established Constitutional right.  Thus, they are entitled to summary judgment on Plaintiff's Section 1983 claims.

### 1.  Excessive Force in Violation of 42 U.S.C. § 1983 (Count I)

To prove a Fourth Amendment excessive force claim, a plaintiff must demonstrate that (1) a seizure occurred, and (2) the seizure was unreasonable.  *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999).  To determine whether a seizure was reasonable, courts assess whether an officer's conduct was objectively reasonable under the circumstances.  *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  Although reasonableness is often a

factual question, summary judgment is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Kopec v. Tate*, 361 F.3d 772, 777 (3d Cir. 2004) (citation omitted).

Although the standard for summary judgment is not higher for deadly force cases, *see Lamont v. New Jersey,* 637 F.3d 177, 182 (3d Cir.2011), the Third Circuit has instructed courts to be "cautious" when the victim is deceased and cannot testify. *Abraham,* 183 F.3d at 294. Thus, the Court "may not simply accept what may be a self-serving account by the officer." *Id.* Instead, the Court must examine circumstantial evidence and determine if it would "tend to discredit the police officer[s'] story, and consider whether this evidence could convince a rational fact finder that the officer[s] acted unreasonably.'" *Id.* The non-moving party, however, must still "present *affirmative* evidence — whether direct or circumstantial — to defeat summary judgment, and may not rely simply on the assertion that a reasonable jury could discredit the opponent's account." *Estate of Smith v. Marasco,* 318 F.3d 497, 514 (3d Cir. 2003).

Here, even considering the caution applicable in this deadly force case, the Court finds that the officers' conduct was objectively reasonable under the totality of the circumstances based on the direct and circumstantial evidence of record. The Court examines that evidence in light of the parties' arguments below.

### a. Whether Baez Possessed and Fired a Weapon at the Officers

The parties first dispute whether the evidence suggests that Baez had and fired a weapon at the officers. Plaintiff claims that Baez neither had a weapon nor fired at the officers. *See* Pl. Resp. SMOF ¶¶ 39, 53. To support this position, Plaintiff points to three pieces of *missing* circumstantial evidence and inconsistencies in the officers' testimony. First, Plaintiff argues that

there is no ballistic evidence showing Baez fired the gun. Second, Plaintiff argues that Dr. Feigin conducted no nitrate or gunpowder residue tests on Baez's hands to determine if he fired the gun.[1] Third, Plaintiff claims that the record contains no fingerprint evidence indicating that Baez handled the gun.

Although the Court is sensitive to the fact that Baez cannot testify, the Court finds that there is simply no "circumstantial evidence that, if believed, … discredit the police officer[s'] story." *Abraham*, 183 F.3d at 294 (quoting *Scott*, 39 F.3d at 915). To the contrary, Defendant has produced direct and circumstantial evidence that provides overwhelming support for the fact that Baez had a gun and fired at officers.

As to the circumstantial evidence, Defendants rely on six facts. First, Defendants argue that when Sergeant Watkins arrived at the scene, he found a silver revolver in the grass in front of the stoop. Pl. Resp. SMOF ¶ 51. Second, they argue that the police photographed the silver revolver at the scene. Third, Defendants point out that in his statement to detectives following the incident, Baez's friend, Carlos Soto, confirmed that Baez carried a silver revolver. Fourth, Defendants note that police recovered a .32 caliber class discharged lead bullet from the dwelling across the courtyard from the Purnell residence. Fifth, Defendants highlight that hospital staff recovered a .32 caliber class discharged lead bullet from Mr. Baez's clothing. Finally, Defendants note that the night before the shooting, Baez posted on Facebook, "Family and

---

[1] The Court notes that, with regard to this second piece of "missing" circumstantial evidence, Dr. Feigin provided a valid reason for not conducting the tests: "the test has been disproven … if anybody is shot anywhere within 30 feet, [gunpowder residue] could be on the hands." Pl. Exhibit T, Feigin Deposition ("Feigin Dep.") [Doc. No. 44-3] at 8:15-21. In other words, because the officers were within 30 feet of Baez when they shot him, Dr. Feigin believed there would be gunpowder residue on Baez's hands regardless of whether he fired a gun.

friends I love u if I see judgement day had enough of cops and hating ass bm," followed by a gun emoji.

Defendants also point to direct evidence that supports the fact that Baez had a gun and shot at officers. First, Officer Painchaud stated "Shots fired at officers!" in his first radio call. and "Shots fired at police" in his second radio call at 7:00:45 P.M. Second, both officers claimed in their depositions that Baez fired his weapon at them. *See* Painchaud Dep. at 51:24 to 52:11; Kerper Dep. at 40:2-6. This evidence, both circumstantial and direct, support the Officer's testimony that Baez had and fired a weapon.

Contrary to this evidence, Plaintiff has failed to adduce any evidence to create a genuine dispute of material fact as to whether Baez had and fired a gun at police. At best, Plaintiff's argument seems to hinge on the unsupported belief that the police *could* have adduce additional circumstantial evidence. For example, the police should have (or could have) done additional scientific testing to affirmatively prove Baez possessed a gun. Because they did not provide these unnamed tests, Plaintiff asserts that Defendants are "missing" pieces of circumstantial evidence.

The Court rejects Plaintiff's argument. Simply suggesting that the police *could* have produced more does not negate the presence of other direct and circumstantial evidence suggesting Baez had a gun and fired it at police. Indeed, Plaintiff's reliance on allegedly missing evidence amounts to the kind of argumentation that the Third Circuit held could not defeat summary judgment in *Smith*. *See Estate of Smith*, 318 F.3d at 514 (explaining that a non-movant must still "present affirmative evidence" and "may not rely simply on the assertion that a reasonable jury could discredit the opponent's account"). Further, Dr. Feigin's testimony undercuts Plaintiff's seemingly baseless conspiracy theory. *See supra* at n. 1. Finally, Plaintiff

fails to understand that, without presenting a single piece of direct or circumstantial evidence that would create a genuine issue of material fact, this Court will not deny a defendant's well-supported motion for summary judgment. *See Lane v. City of Camden*, No. 11-cv-5584, 2015 WL 5603039 (granting summary judgment because plaintiffs could not point to any affirmative evidence, either direct or circumstantial, to dispute that the decedent advanced on the officers with a knife). At bottom, Plaintiff here has failed to adduce evidence to oppose the motion. The Court therefore finds no genuine dispute of material fact as to whether Baez had and used a firearm.

### a. Inconsistencies in Defendants' Testimony

Next, Plaintiff suggests that a jury must consider the evidence in this case because inconsistencies in the officers' testimony calls into question the credibility of their claim that Baez shot at them. Pl. Resp. SMOF at ¶ 39. The inconsistencies include: (1) whether Officer Painchaud approached Baez with his weapon in a "low-ready position" or pointed his weapon directly at Baez, (2) whether Baez started to put his hands up when ordered to do so, (3) how far the officers were from Baez at the time of the shooting, and (4) the officers' failure to mention a pause in the shooting. *See* Plaintiff's Opp'n Brief [Doc. No. 45] at 8.

The central issue is whether the factual discrepancies are material to the claims before the Court. *See Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985) ("[T]he mere existence of factual issues where those issues are not material to claims before this Court will not suffice to defeat a motion for summary judgment.") As such, a party may not defeat a motion for summary judgment by simply pointing to *immaterial* evidentiary inconsistencies. *See Friedrich v. Cadle Co.*, 33 F. App'x 638, 639 (3d Cir. 2002) (emphasis added); *see also Smith v. City of Brooklyn Park*, 757 F.3d 765, 773-74 (8th Cir. 2014) (alleged

inconsistencies in officers' statements do not create genuine issue of material fact when multiple officer statements support the material fact that suspect was armed).

The Court finds that Plaintiff's alleged inconsistencies have no impact on the issues before the Court. *See Jersey Cen. Power*, 772 F.2d at 1109 (explaining "the factual issue in dispute must be *material* to the resolution of the dispute. That is, it must be outcome determinative under the applicable law") (internal citation omitted). Said another way, none of the supposed inconsistencies impact the Officer's reasonable belief that Baez possessed and fired a weapon. First, the precise angle of Officer Painchaud's weapon as he approached Baez is irrelevant. Second, this theory that Baez initially complied is not outcome determinative. When viewed in a light most favorable to Plaintiff, these theories merely suggest that Baez was not a threat initially. His initial non-threatening behavior, however, does not undercut evidence that he later brandished and fired a weapon. Plaintiff simply mischaracterizes the relevant inquiry before the Court.

Relatedly, Plaintiff's focus on the distance of the Officers and this supposed pause during the shooting is misplaced. For example, whether the officers were five or ten feet away from Baez at the time of the shooting does not create a dispute as to whether the officers reasonably believed that Baez posed a threat. The theory of the delay also offers little support to the question of the Officer's objective reasonableness. For example, even if there was a thirty second pause in the shooting, no reasonable juror could infer that this period coincided with police acting unreasonably. After all, nothing about the pause allows one to reason that Baez no longer presented a threat, which the Court will discuss further below. Again, Plaintiff offers a minor distinction that bears no discernable difference on the evidence of objective reasonableness.

### b. The Officers' Use of Force Was Objectively Reasonable

Having "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*," *Scott v. Harris*, 550 U.S 372, 381 at n. 8 (2007), the Court turns to whether the officers conduct was objectively reasonable under those circumstances.

In making that determination, courts consider the totality of the circumstances, judged "from the perspective of the officer at the time of the incident and not with the benefit of hindsight." *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015). The calculus must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.  In assessing the totality of the circumstances, courts may consider "all of the relevant facts and circumstances leading up to the time that the officers allegedly used excessive force," not just the facts and circumstances at the "precise moment that excessive force is applied." *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004). Under *Graham*, relevant factors include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Other relevant factors include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time."  *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997).  Courts may also consider whether the "physical force applied was of such an extent as to lead to injury." *Id.*

Here, the Court finds that the officers' conduct was objectively reasonable under the circumstances.  As noted above, the undisputed record shows that the officers discharged their weapons because Baez fired at them—an extremely serious crime—and posed an immediate threat to their safety.  Indeed, the officers responded to a highly-charged domestic dispute having been informed that Baez was possibly armed— additional facts that support the officers' reasonable belief that Baez posed a dangerous threat to themselves and the surrounding community.  *See Conde v. City of Atl. City*, 293 F. Supp. 3d 493, 501-502 (D.N.J. 2017) (stating that while there were some questions of fact as to whether decedent possessed a gun, the officer's belief that Mack had a gun was objectively reasonable).  That Baez shot at the officers in an act of resistance further supports the reasonableness of the officers' conduct.  Although the Court regrets that Baez lost his life and appreciates how his loss may impact those around him, it must find that under these dangerous and rapidly evolving circumstances, no reasonable jury could find that the officers acted unreasonably in shooting Baez.

This, however, does not end the excessive force inquiry.  As the Third Circuit has noted, officers who are "initially justified in using force" may not "continue to use such force after it has become evident that the threat justifying the force has vanished."  *Lamont*, 637 F.3d at 184.

Here, Plaintiff suggests that even if the officers were justified in firing at Baez, a genuine dispute of material fact exists as to whether their actions eventually became unreasonable.  Pl.'s Br. at 9, 13.  Plaintiff's argument is based on the witnesses that heard a pause in the shooting.  *See* Hunt Statement at 4:1-32; 6:16-19; Jones Statement at 5:33-40; Ashley Purnell Statement at 21:7-9; Rowshon Purnell Statement at 29:25-45.

Even viewed in the light most favorable to Plaintiff, evidence of a pause in the shooting fails to suggest that the officers continued to shoot at Baez after he was down and no longer a

threat.  This is because none of the four witnesses who heard a pause actually *saw* Baez during

the shooting.  For instance, Jermaine Hunt stated that when he heard the gunshots, he did not

know whether Baez was up or down because he did not see Baez in the doorway.  Hunt

Statement at 6:11-14.  Nor does his statement describe whether the officers had neutralized the

threat when he heard the shots.  In addition, neither Barbara Jones nor Rowshon Purnell saw

Baez during the shooting.  Finally, although Ashley Purnell said that she saw an officer fire one

more shot at Baez as she looked out the door, she later recanted this statement, indicating that

she never saw anyone shoot.  CCPO Report at 13.  Again, Plaintiff merely points to a

discrepancy in factual accounts to allege a material difference in a material fact.  The alleged

pause, even taken in a light most favorably to Plaintiff, has no bearing on the issue of objective

reasonableness.

In conclusion, Plaintiff offers no triable facts to overcome qualified immunity as to the

officers' split-second decision about when the threat was neutralized.  In the absence of *any*

affirmative evidence that the officers continued to use force absent a threat, this Court must

conclude that Officers Painchaud and Kerper acted reasonably in using deadly force against

Baez.  *See Scott,* 550 U.S. at 381 n. 8 (the reasonableness of a police officer's actions "is a pure

question of law" once the Court has "determined the relevant set of facts and drawn all

inferences in favor of the nonmoving party *to the extent supportable by the record* ") (emphasis

added).   The Court therefore rejects Plaintiff's argument that the officers acted unreasonably and

grants summary judgment to the officers on Count I.

### 2.   Failure to Intervene and Conspiracy Claims (Counts II and III)

In addition to Plaintiff's excessive force claim, Plaintiff claims that Defendants violated

his Constitutional rights because after the pause in the shooting, the officers had a duty to

prevent the continued use of deadly force on Baez.  Pl. Br. at 10.  In support of the conspiracy

claim, Plaintiff similarly argues that there are "material facts in dispute as to whether the Officers

formed a meeting of the minds when they continued to shoot Baez after they had time to

determine that he was no longer a threat."  Pl. Br. at 11.  Defendants, however, argue that these

claims must fail because they did not use excessive force or violate any of Baez's constitutional

rights.  Defendants' Brief in Support of Motion for Summary Judgment ("Def. Br.") [Doc. No.

42] 21, 22.

The Court agrees with Defendants that both claims must fail.  As explained above,

Defendants did not use excessive force, and without an underlying constitutional violation, both

conspiracy and failure to intervene claims are not cognizable.  *See Bryant v. City of Philadelphia*,

518 F. App'x 89, 93 (3d Cir. 2013) ("In the absence of demonstrating that any of the Defendants

engaged in excessive force or committed another constitutional violation, [plaintiff] [] also

cannot succeed on a claim of failure to intervene."); *Hickson v. Marina Assocs.*, 743 F. Supp. 2d

362, 377 (D.N.J. 2010) (finding that the plaintiff could not proceed with his conspiracy claim

without "any violation of his federal constitutional or statutory rights").  Thus, the Court grants

summary judgment to the officers on Counts II and III.

### 3.  Supervisory Liability and *Monell* Claims (Count IV and V)

Plaintiff does not oppose Defendants' Motion as to Plaintiff's claim for Supervisory

Liability (Count IV) or Plaintiff's *Monell* claim (Count V) against Chief Thompson and Camden

County.  Pl. Br. at 1.  Thus, the Court grants Defendants' summary judgment on Counts IV and

V.

### B.  Remaining State Law Claims

Finally, the Court turns to Plaintiff's remaining wrongful death and survival claims, which arise under New Jersey state law (Counts VI and VII). As with Plaintiff's other claims, Defendants are entitled to summary judgment because Counts VI and VII are predicated upon a showing of liability against Defendants, and as explained above, Plaintiff has not made this showing. Thus, the Court grants Defendants' motion for summary judgment on these claims.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment. An Order shall issue.

Dated: 08/09/2019                                                    s/ Robert B. Kugler

                                                                            ROBERT B. KUGLER

                                                                            United States District Judge